Good morning, your honors. May it please the court. Good morning, Judge Gould. Chief O'Rourke, on behalf of Mr. Silva, I would like to reserve three minutes for rebuttal, please. My client's appeal presents two sets of discrete issues. Issues one and two deal with the alienage of one of the individuals found in his car. Would you kind of go over that again? Your issues one and two, you have to speak right in the microphone. I'm sorry. Is this better? Okay. So the first two issues deal with the alienage of Mr. Tapia Martinez. As to those issues, I have nothing to add beyond what's in the brief. I'm happy to answer the question if the panel has any. But my plan was to focus on issue number three, wrongful admission of expert testimony of unmodus operandi of alien smuggling operations. Okay. On that issue, you know, the issue has been thoroughly briefed. So what I wanted to do was focus on what I thought were three most important areas to kind of to bring home. One, this is a case about a legal error, not a challenge to a discretionary call made under a correct legal standard. Judge Sabra's ruling in this case is at pages 4ER583 to 587, and he pretty clearly states that he sings the law since Vallejo has changed and that the requirement that in non-conspiracy cases independent evidence connected as a defendant to the scheme be presented no longer applies. That's his belief. I don't believe that's correct. I think that requirement continues to apply. The circuit is continuing to apply. It's important. And Judge Sabra made his ruling both on Rule 401 and 403 through that incorrect legal prism of believing that requirements is not there. And I think this is particularly troubling because the way the Vallejo line of cases envisions the district court's role here is to make sure that in cases like this one, organizational knowledge is not unfairly imputed to the defendant, unless there is, at minimum, there is some of the court is using the term substantial evidence connecting him to the conspiracy. Let me stop you there. So I think you're citing a case where the court noted that there was substantial evidence connecting the defendant to the conspiracy, but there was, I don't think the court said that substantial evidence was required. I think there just has to be sufficient evidence. But what is your authority for saying that there has to be substantial evidence to connect the defendant to the... Well, I think the cases actually do use the word substantial evidence. Well, which ones? Can you tell me? Well, I would think both Vallejo and Pineda-Torres and probably Mejia Luna use language to that effect, because that's my best recollection. The other reason why I'm fairly certain that this is what is intended is because of the distinction between non-conspiracy and conspiracy cases. Because the reason that you don't need this in a conspiracy case is, presumably, if the government charges it was a conspiracy, there is enough evidence to go before a jury that you're a member of the conspiracy. So that need is addressed in the conspiracy cases this way. In non-conspiracy cases like ours, you have to have, at minimum, enough for a jury to conclude that he's a member of an alien smuggling conspiracy. That's why I think it's not some tenuous evidence that connects him to the conspiracy. I think, at minimum, the evidence has to be sufficiently strong to put up before a jury a rational inference that he's a member of the alien smuggling conspiracy. And I think the ways the courts have applied this requirement in practice, they have upheld this only when there was evidence connecting defendant to the alien smuggling or drug smuggling conspiracy much more robust than what you have here. And that kind of brings me to why I think the expert testimony here was, I believe, outcome-determinative when you can compare it to the first trial, where that expert testimony wasn't presented. Because, you know, obviously, you have Mr. Silva in his SUV with these two individuals. But if you look at it from his standpoint, and, you know, I've transmitted to the court photographs that I think best encapsulate his perspective. If you just have your car repaired, come up and drive, you know, he testifies that he didn't even look in the trunk. He had nothing to put in it. And there is nothing to suggest that that's not true. If you just look at it as a casual observer, you know, it's a big SUV. You just kind of get in and go. You know, I'm not a car person. I look at these photographs. Nothing tips me to the fact that there's something untoward in the cargo area. You know, does it describe every personal experience? I'm sure not. Some people will walk around their car every time and check for every little thing. So it's possible some people do that. But it's not unreasonable for him to have gone to his car after transmission repair and just drive to the border, because that was his plan for the day. And we know from the government's expert that the car's transmission had been recently repaired. So he's not making that up. So at best, you have, I think you just basically have innocent circumstances. He got into his car. He drove to the border. Now, the government has argued He had driven to the border and crossed the border several times before on the days immediately prior, right? Well, on several days immediately prior, because he bought a car several days. Like, I think he bought the car slightly less than two weeks before he crossed the border. So he testified that he crossed to get the car registered, get insurance, get a smoke check. Those are normal things to do when you buy a new car. And the government hasn't shown that there was anything other than that in his crossing of the border. He lives in Mexico, but he's an American. You know, there is nothing inherently suspicious in him crossing the border to do that. You know, much argument was made about the fact that he crossed at least once on November 30th, and he could not explain. He couldn't remember. He said, I remember why I crossed that day and then called my landlord. You know, this, the retrial was in February of 2024. The crossing was in late November 2022. That a 60-year-old or 69-year-old man couldn't remember precisely why he called somebody that day. Honestly, that would be my experience. You know, I'm fairly younger than Mr. Silva, and I think that quite possibly mean I wouldn't necessarily remember. I would have been shocked if he told the jury exactly why he called him, for what reason, and gave him details. So again, there is nothing inherently suspicious about that. And as far as his landlord, that is all we know about this person is that is the person he's renting the house with from, and this is that somebody who he bought the car from. Again, they have a pre-existing general relationship. It's not like he's communicating with somebody that he does not already know. So all of those, all of the facts have fairly reasonable non-criminal meaning. And you put that was a fact that Mr. Silva has no prior record. He, you know, he has means of income. There is no showing like we have in some cases of a defendant who has a dire financial need. He's, again, he's near 70, so there's no motive for him to do this. So if you put all that together, the government's case without the expert testimony is very tenuous at best that he knew. I mean, obviously it's his car. So, you know, on that basis, it goes to a jury just to determine if he knew or he didn't. But without the expert, these are very ambiguous circumstances, and I'm not surprised that the first jury declined to unanimously convict. So I do think that the expert testimony played a key role here. Those are the three points that I wanted to make with the court. I'm happy to answer questions about anything else. Recall for me, if the first jury didn't convict him, why did we have a second trial? Because, well, it was a hung jury, so it was a government retrial. Yeah. So I'm sorry, I'm not using precise terminology. It was not a acquittal. You're right. Any other questions, Judge Gould? Not for me. Okay, then I would like to reserve the rest of my time for rebuttal, please. Thank you. Good morning, Your Honors, and may it please the court. Nicholas Pilchak for the United States. The district court was well within its discretion to admit this routine modus operandi expert testimony. The court didn't use the wrong legal rule or announce the wrong legal rule that would automatic finding of abusive discretion. The reply brief in this case from Mr. Silva says incorrectly that the district court found that circuit law on this issue has changed not to require a substantial connection, but that's not what the district court said. The district court simply said that the law has changed, which I'll get to in one moment, and it didn't specifically announce that there is a requirement to connect the defendant to an abusive discretion. There clearly was ample evidence in the record connecting Mr. Silva. Why don't you tell us about that? Certainly. So I think the court's question a moment ago to Mr. Silva's counsel is the best place to begin. Those three prior trips into the United States with the load vehicle, the only time that the defendant had driven that load vehicle into the United States were short turnaround trips where he immediately returned to Mexico or within the space of a few minutes returned to Mexico after entering the United States, which was proved by cell site location information at trial. On each of those trips, Mr. Silva calls his landlord, Fernando, immediately after crossing. When cross-examined about this at trial, because Mr. Silva elected to take the stand in both trials, he testified that one trip was to buy guitar strings, but then admitted on cross-examination he'd have no reason to call his landlord about his trip into the United States to buy guitar strings. The expert evidence that was admitted explained it's common for alien smuggling organizations to burn the plates or establish several trips into the United States in a new vehicle. Burn the plate? Correct. To create a crossing record with the customs officials so that the first time you're driving a new vehicle with a new driver into the United States, it doesn't have two living, breathing people stuffed in a secret compartment in the back. It's maybe the fourth time or the tenth time so that customs gets comfortable with the car before it comes in loaded. So I think that's the best place to start here. But then, of course, the evidence of what happened on the day of Mr. Silva's arrest incontrovertibly establishes that there is an alien smuggling organization, that there's a fully-baked operational alien smuggling conspiracy that brings the two material witnesses to a place where they're loaded into Mr. Silva's car, which is registered to him in this compartment that's highly modified and dangerous. The United States vehicle expert says he cut his hand several times just while inspecting the compartment as part of the government's investigation. The material witnesses were separated from the car's spinning axle by a piece of carpet. Part of the compartment was held together with chewing gum. It was a highly modified, dangerous, unusual compartment that essentially replaced the entire back end of the Ford Explorer under the carpet in the trunk area. And there's two living, breathing people who are loaded in there and then brought to the port of entry when Mr. Silva gets in and starts driving the car. Granted, there's no evidence that he saw the two material witnesses go in the back of the car. But other than that, every fact in his case is consistent with the factors that this court looked to in Mejia Luna to find that there was more than enough evidence in that case to establish a connection between the defendant and an alien smuggling organization. And in fact, there's more evidence in Mr. Silva's case, we would submit, to establish his connection with the smuggling organization, such as it was his vehicle with a highly modified compartment. Mejia Luna was not a compartment case. And then, of course, those prior crosses into the United States where he's in close telephonic contact with Fernando, who certainly seemed to be his smuggling handler as part of the scheme. So that's the evidence of the connection here. To the extent this court has any concerns about the district court statements that the law has changed since Vallejo and Pineda-Torres, we think that there's two explanations for that that are perfectly consistent with this court's case law. One is the footnote in our brief that lays out at least 14 times since Mejia Luna and a companion case, Lopez Martinez, this court has admitted modus operandi expert evidence, much like the evidence in this case. In fact, sometimes more potent evidence. For example, an expert who takes the stand and says, these kinds of drivers almost always know what they're carrying, whether it's drugs or aliens. The expert in this case didn't even say that. He just explained how the organizations typically function and some of the different roles in an alien smuggling organization. But 14 different times, this court has admitted that kind of evidence. The only time that it has refused to admit that kind of evidence since Mejia Luna, it was because the witness was insufficiently qualified. But here, even Mr. Silva agrees that the testifying officer, Officer Nazarino, was qualified to deliver this testimony. Mr. Pilchik, I've been taking notes and I see that you have two points upon which you say there's substantial or sufficient evidence upon which the court could admit the expert testimony. One, are the three prior trips shortly before the subject trip. And two, it was his vehicle. Yes, Your Honor, but to build on that... I mean, his position is that he didn't know that the compartment was there. He took his car to have repairs made. He didn't know that this was being done. And he was surprised as anyone else when the two men were there. Certainly. And I think, first of all, the jury obviously rejected that beyond a reasonable doubt at the trial. Second of all, the trial judge who saw Mr. Silva testify twice enhanced his sentencing guidelines for obstruction of justice because it found that he had testified falsely when he gave that innocent explanation. But I also think that's inconsistent with all the evidence in the case. And I want to return to Your Honor's question in a moment. But essentially, his story was, I was driving 125 miles from the port of entry to Gardena, California, with these two gentlemen stuffed in this dangerous compartment under my trunk. And I think the jury quite logically rejected that and said, we find it not reasonable to believe you had no idea that this was happening. Why was he going to Gardena? He said that he was going to a football game with his son who he hadn't telephoned, hadn't made any arrangements with, but that he intended to surprise when he arrived 125 miles from the port of entry up to the football game. So all of it, Your Honor, frankly, reeked of implausibility and the jury rejected it in reaching its conclusion. But to go back to Your Honor's question. So, I'm sorry. Please. I think your friend on the other side is suggesting that the jurors would not have made that connection without the expert testimony. That you needed somebody to explain burning the plates and taking the load vehicle across the border. And you needed somebody to explain that the person driving would not typically see the individuals being placed in the car, all of those sorts of things. So that this was the linchpin. This was the key testimony. So how do you respond to that? So two things. First of all, the first jury hung, but it hung 11 to one for guilt. That was the poll for the jury verdict in the first trial. Second of all, I agree. The expert testimony made that other evidence more sensible to the jury and it allowed them to understand its significance much better. That's what this expert testimony is for and has been admitted to do in this court's precedent. So I agree it had that effect at the second trial, but that's its acknowledged purpose under this court's case law. But to the court's question, I think the evidence is still persuasive by itself. It's just more persuasive with the jury. Well, what do you think is happening on these three prior trips when he comes into the United States and immediately turns around and goes back to Mexico after calling his landlord on the telephone, the same landlord he gave the car to, to be repaired when the special compartment was made in the back. But an expert can explain to the jury, that's how this organization, organizations like these typically function. So I agree it makes that evidence more powerful, but that's a permitted purpose under this court's case law. So what is the standard for the connection between the alien smuggling operation and the defendant? What evidence needs to be shown before that evidence is admissible? Whatever the standard is, it can't be higher than what was required in Mejia Luna, which I think is the best articulation of what's required. And in Mejia Luna, the evidence was essentially just that the defendant driving the car arrived in a car that matched the description that had been at the appropriate time and place, and then watched them get in the car and conceal themselves and drove off to the predetermined destination. That was it. Was there any evidence that this defendant watched the two men get in his car? No. There's a big difference between the two cases. It is a significant difference, Your Honor, and that pulls in Mr. Silva's direction. But the existence of a highly modified dangerous compartment in the defendant's own vehicle and the prior three crossings, which I referred to a minute ago as burn runs, are an important difference that pulls in the government's— He claims he didn't know the compartment was in there. Correct. And I think the jury clearly rejected that, as did 11 jurors from the first trial and the district court, in finding that he obstructed justice and testifying to that version. But that's correct. That is his version of the facts. I think it's consistent with almost all of the trial evidence and his explanation for why he was calling his every time that he drove into the United States with his new vehicle that would be converted into an alien. What was the explanation? Why was he calling his landlord? He had no explanation for two of the trips. For one of the trips, I think he said something about wanting to talk to his landlord about the condition that the car was in. Did he buy the car from the landlord? That was his explanation, yes. And his explanation also was, I turned the car over to my landlord for transmission repairs, and that must have been when this compartment was added. So that's Mr. Silva's version of the facts. And the transmission repairs were made? There was some modifications to the transmission, yes. There were also massive modifications to the rest of the car. For example, they cut the exhaust line to build the compartment under the back of the Explorer, and the government's automobile expert said that would result in exhaust fumes pooling inside the vehicle when you were driving it. Although we acknowledge in our brief the parties stipulated that one of the material witnesses said he could breathe fine in the compartment. I didn't get the last few words you said. Sure. One of the material witnesses would have testified that he could breathe okay in the compartment even though the exhaust line had been cut right by his head. So to return to the change in the law, I don't know if the court has any further concerns about that. The district court did say, I believe the law has changed. One other way that we think the law has changed since Pineda-Torres is Mr. Silva's arguing it's an impermissible purpose to admit this kind of expert testimony to show that the driver likely knew about the cargo that he was carrying. But that principle can't possibly be true after the Supreme Court's decision last year in Diaz versus United States, where it admitted structure evidence in a drug trafficking case specifically for the purpose of showing most couriers know about the drugs that they're carrying. So at this point, that argument we think is off the table, but Mr. Silva is still advocating for it. I think that's also a perfectly reasonable explanation for any statement by the district court that the law has changed since Pineda-Torres. What was his explanation why he made those three trips? One was guitar strings, your honor, and one was I believe to register the vehicle and the third escapes me at the moment. And the third was? I can't recall. Did he actually register the vehicle? I believe he did. So with that, your honor, we think that there's ample connection between Mr. Silva and what everyone acknowledges is a fully baked alien smuggling organization that was more than sufficient to admit the expert testimony in the discretion of the trial court. And there was no legal error in announcing the rules of the road for admitting that testimony by the district court. Unless the court has any other questions, I'd be prepared to submit. So the defendant says he went across the border in the United States to buy guitar strings which were not available in Mexico. I don't know that he was specifically examined on whether they were available in Mexico, but that was his explanation. Okay, thank you. Very good. Thank you, your honor. Thank you. Your honor, I have a couple of points to make and reply. Perhaps you can fill in the reason for the third trip, guitar strings registration and? So I think he said registration, serums and smog, and perhaps guitar strings. I don't recall how he apportioned them between different trips, but I believe most of the trips were to get the car insured and smuggled and registered. And there was one trip where he said that he went to guitar strings. And Mr. Silva is a musician. He has a lot of guitars in his house. So it's not, again, it's not an unreasonable explanation. He's a retired musician. One other point of disagreement I have with Mr. Pilchuck about the record is these were not short minute burn trips. I mean, I think one of them was for at least an hour, which would have been sufficient for him to drive into San Diego on his landlord's recommendation to get the car registered, smoked and insured. Mr. Silva has lived in Mexico for the last several years since the pandemic. So it's not unreasonable that his landlord might know more about the lay of the land.  Well, you know, I assume that people who live in Tijuana have documents to cross into San Diego. They would know where things are in the areas immediately next to the border. And we don't know much about this landlord. Mr. Pilchuck keeps calling him a member of their alien smuggling organization. We have no evidence that that's true. All we know about him is that he sold Mr. Silva his car. He's renting a house from him. And Mr. Silva asked him to help him with the repair. You know, to give the court context, Mr. Silva has lived in Mexico for several years. He still doesn't speak Spanish. So again, you know, it's nothing unreasonable about relying on somebody local that he knows for things like, where do I repair the car or where do I go to get it insured and registered? So if the landlord, Francisco, is not part of an alien smuggling operation, then that would mean that when the vehicle was turned over to some unknown repair shop, somebody at the repair shop took it upon themselves to modify the vehicle and place two people in it without telling the landlord, without telling Mr. Silva? Well, to be honest with you, I don't know what the relationship was between this landlord and the alien smuggling organization. Is he an active member? Is he just somebody who passes information? All those things are possible. But my point is we don't know what his precise role is. And I don't think it's fair on this record to say that, you know, that establishes communication with the alien smuggling operation when we don't know what part, if any, he's playing in it. And we don't know what they're talking about. And this brings me to my disagreement with Mr. Pilchuck about the law. For example, in Mejia Luna, as I think your honor has alluded, the facts are much more compelling for the government to admit the testimony because there the defendant came to a point in a white car and it was evident that the guide for the aliens told them to come to a specific point where somebody in the white car would come. And then the defendant watched these people come into his car and hide themselves in it. I mean, that's a much more compelling case. How did they hide themselves? They came into the passenger compartment? He doesn't, you know, he doesn't say he just said he watched them hide or secret or hide themselves in the car. But they weren't in a hidden compartment under the floor? I, you know, the court obviously didn't use the word compartment. So I can't say without looking at the brief or the record, but I believe the opinion used the words secreted or hid themselves in the car. Counsel, a couple of questions. Yes. Mr., the defendant here, he lived in Tijuana, right? Right. He was, he was renting a house in Tijuana since 2019. The stipulation says he was driven to a house in Tijuana and the car in question was a dark colored SUV, correct? I, that sounds about right. Right. Thank you. And I'm sorry, was there a question beyond that? Okay. Right. Right. So in conclusion, if I could please make a brief concluding remarks. I don't, first of all, I don't think the law has changed and continues to be the same. I do think Judge Subra said that the law changed and in no longer requiring the connector requirement to be there. And I think this is evident also from his reference to Lopez Martinez. Lopez Martinez is a conspiracy case, clearly not applicable to a case like ours. So I think there may have been some confusion in how the court was viewing the cases. And I think that confusion persists in the government's brief. In their long string of sites of cases, the cases are either conspiracy cases or cases where this issue of connecting evidence wasn't addressed and cases are not authority for proposition that were not considered. Or even if these unpublished cases don't precisely explain the basis for admission, they also don't elaborate on either what was before the court, what issues the defense raised in the objection. I just think it's inaccurate to say that there is this mountain of cases where the courts are now admitting this routinely. It's just not there. In a few cases that actually elaborate on what evidence is required, it's much more robust than what you have here. So I would ask the court to reverse all four counts on my client's conviction and remand the case. Thank you. Thank you. Counsel, thank you for your arguments this morning. This case is submitted. Thank you. And we are in recess until tomorrow morning. I'll rise. This court stands in recess till tomorrow morning.
judges: GOULD, BEA, BADE